**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PHILMINGO JAMISON,** | : | **CIVIL NO:1:08-CV-1405** |
| | : | |
| **Petitioner,** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **JOHN KERESTES et al.,** | : | |
| | : | |
| **Respondents.** | : | |

## REPORT AND RECOMMENDATION

### I.   Statement of Facts and of the Case

#### A.   The Killing of Dennis Naylor

In the early morning hours of July 19, 2000, Dennis Naylor sat in the front seat of a car parked on the 400 block of Moul Alley, in the city of York. (Doc. 12-3, p.84.) Naylor, a reputed drug trafficker, had parked his car in a neighborhood in York that was known as "the Jungle." (Id., pp.82-4.) "The Jungle" was an area in York that was notorious for crime, drug trafficking and random acts of violence. On July 19, 2000, Naylor was to become a victim of this violence.(Id.)

Shortly after 3:00 a.m. on July 19, 2000, residents living in the 400 block of Moul Alley were roused from their sleep by the sounds of an argument between Naylor and others, an argument that was punctuated by a burst of gunfire. (Doc. 12-4,

pp.31-42, Doc. 12-5, pp.1-12.) Police were summoned to the scene, but when they arrived moments later, the street was deserted. Police found Naylor inside his car, dead, the victim of four bullet wounds.(Doc. 12-3, pp.89-100.)

### B.     The Police Investigation and the Arrest of Philmingo Jamison

A police canvas of the neighborhood in the immediate wake of this shooting was unavailing. While a number of residents had heard the argument that led to Naylor's shooting, and had been risen from their beds at the sounds of gunfire, no one was able to identify Naylor's killer, or killers, that evening. (Id.) Similarly, police forensic examination of the crime scene, and the autopsy of Naylor, recovered ballistic evidence, in the form of .40 caliber rounds and shell casings, along with fingerprints. (Doc. 12-4, pp.1-30.) However, none of this forensic evidence linked Jamison–or any other identified suspect–to this crime scene. (Id.)

While their initial crime scene investigation was stymied, within a day of the shooting police began receiving information from various sources that drug trafficking rivals of Naylor's from New York were responsible for his murder. Acting on this information, police actually arrested a New York resident, Jermaine Jackson, and charged him with the murder of Dennis Naylor. (Doc. 12-5, p. 22.)

One of these police sources who first identified Naylor's killer as a New York drug trafficker was a man named Dereck Sease. By 2001 Sease was himself a local

drug trafficker, a convicted felon, and a parole violator who was seeking favorable treatment from the local authorities on pending charges. (Doc. 12-5, pp.12-37.) When Sease first met with police, on the day after Naylor's murder, Sease told police that he had been present at the scene of the shooting, and identified unnamed New York drug dealers as Naylor's killers. (Id.)

After first positively identifying Naylor's killers as men from New York, Sease subsequently, abruptly and dramatically changed his statement, and implicated Philmingo Jamison as Naylor's killer. (Doc. 12-5, pp.12-37.) Police investigation of Sease's latest, and contradictory, account of this shooting failed to uncover forensic evidence linking Jamison to this crime. Thus, a search of Jamison's home by police on August 3, 2000, resulted in the seizure of firearms and ammunition, but none of the weapons or ammunition seized in any way linked Jamison to Naylor's shooting death. (Doc. 12-6, pp.10-11.) Similarly, while police recovered some fingerprints at the crime scene, none of those fingerprints was ever linked by police to Jamison. (Doc. 12-4, pp.12-30.) Furthermore, when police arrested and interviewed Jamison, he provided an alibi, claiming that he had been at a local bar on the evening of the shooting and had gone directly home from that bar on the night Naylor was killed.(Doc. 12-6, pp.9-10.)

Police did, however, identify a second alleged eyewitness to this shooting, Lizabeth Ray, as known as Beppie, a drug addict, petty thief and criminal recidivist with more than a dozen prior retail theft convictions on her criminal record. (Doc. 12-7, pp.8-31.) Like Sease, Ray was seeking favorable consideration from police on a series of charges she was facing. (Id.) Like Sease, Ray was also willing to admit that she had been present at the scene of the crime when Naylor was shot and killed.(Id.) Moreover, like Sease, Ray provided police with contradictory accounts of what she saw at the crime scene on the early morning hours of July 19, 2000.(Id.)

According to Ray she had traveled to the 400 block of Moul Street on the morning of July 19 to buy crack cocaine. While on the street, Ray claimed to have observed an argument between Naylor, who was seated in his car, and two men who she identified as Philmingo Jamison and Ronald Sykes, also known as "Black". (Id.) Ray later provided two different sworn accounts of what she observed. Initially Ray claimed that the argument between Naylor, Jamison and Sykes erupted into violence, with Jamison and Sykes both pulling pistols and shooting Naylor as he was seated in his car. ( Id.) By the time of Jamison's trial in 2001, Ray had altered her account of this shooting, identifying Jamison as the sole shooter of Naylor. (Id.)

Police arrested Jamison on August 3, 2000. By September 26, 2000, Jamison was charged in the Court of Common Pleas of York County for his alleged role in the

shooting death of Dennis Naylor. (Doc. 12, pp. 1-4.) Jamison was initially charged with first-degree murder, third-degree murder, and manslaughter, in connection with this slaying. At the time that these charges were lodged, no forensic evidence linked Jamison to this shooting. Thus, none of the firearms or ammunition recovered from Jamison had been tied in any way to Naylor's death, and none of the fingerprints found on Naylor's car at the crime scene matched Jamison. Instead, the case against Jamison rested upon the word of two corrupt source witnesses, felons, drug traffickers and drug users, each of whom had positively identified others as responsible for Naylor's death, before asserting that Jamison alone had killed Naylor. It was upon this thin reed that the Commonwealth sought to hold Jamison accountable for the murder of Naylor.

C. **Jamison's Trial and Conviction**

Jamison was represented in this murder case by Attorney Harold Fitzkee. Attorney Fitzkee subsequently passed away following the trial of this case and thus was unable to address the rationale behind any of the decisions, choices and tactical judgments made by the defense in this case, a tragic fact which further hobbles efforts to assess the effectiveness of counsel's performance in this case. However, the court record reveals that the defense of this case was premised, at least in part, upon a claim of an alibi by Jamison. Specifically, prior to trial Jamison filed a notice of alibi

defense, placing the Commonwealth on notice that he might present a defense of alibi at trial. (Doc. 12-2, p.19.)

Jamison's case proceeded to trial on June 4 and 5, 2001. This trial was, by the Commonwealth's own admission, a flawed proceeding where errors occurred.(Docs. 12-3 through 12-7.) In the course of this two-day murder trial the Commonwealth presented some 14 witnesses. Many of these witnesses, however, testified to matters which bore little relevance to the issue of Jamison's innocence or guilt on this charge. Thus, the jury heard from nearby residents who heard the fatal gunshots, but could not identify Naylor's killer.(Docs. 12-4 and 12-4.) The Commonwealth also presented police witnesses who described the crime scene and forensic investigation conducted in this case. (Doc. 12-4, pp.1-30.) Notably, none of that crime scene or forensic evidence in any way tied Jamison to Naylor's death.(Id.)

The Commonwealth then presented evidence in its case-in-chief which indicated that Jamison had claimed an alibi at the time of his arrest. According to the arresting officer, at the time he was taken into custody Jamison had provided an alibi to police stating that:

> [Jamison] denied any involvement. He stated that on that evening, he rode his bicycle out to Gus's Bar and that he rode right home. . . . . He stated on the evening of July 18th going into the early morning hours of July 19th, he rode his bike to Ultraviolet's Bar. . . . . He left Gus's by

himself right before closing. . . . .He said he rode his bike straight home
to 51 East Cottage Place.

(Doc. 12-6, pp. 9-10.)

Despite the introduction of this alibi into evidence by the Commonwealth's own witness, and notwithstanding the defense's prior notice of its intent to rely upon an alibi defense, no alibi was presented by Jamison's counsel at trial, the defense did not argue Jamison's alibi in its very brief closing argument, (Doc. 12-7, pp.44-51 ), did not request an alibi instruction, and the jury was not instructed on any claimed alibi defense. In its closing argument, the Commonwealth took advantage of this defense omission, arguing in the absence of any articulated alibi defense that: "The whole case comes down to whether you believe Philmingo Jamison was there." (Doc.12-7, p. 52.) Thus, the Commonwealth's trial presentation skillfully exploited the wholly unexplained tactical choice by the defense to forego an alibi defense which had been presented by the Commonwealth's own witness.

The jury also heard substantial testimony that endeavored to link Jamison both to drug trafficking, and to various gang affiliations in York. This testimony, which nearly matched in length and intensity the eyewitness testimony tying Jamison to this shooting,[1] was admitted notwithstanding its potentially prejudicial impact on the basis

---

[1]Compare testimony of eyewitnesses Dereck Sease, (Doc. 12-5, 12-37) and Lizabeth Ray (Doc. 12-7, pp.8-31) with testimony of Robert Gilmore (Doc. 12-5,

that it provided a motive for the shooting, which the Commonwealth alleged arose out of a turf dispute between rival drug trafficking gangs.

After presenting this evidence of limited relevance, the Commonwealth then submitted evidence to the jury which it conceded at trial was "not[] relevant" to this murder charge, ( Doc. 12-7, p. 56 ) and which the Superior Court later characterized as be of "questionable" relevance in this case. (Doc. 12-3, p. 6.) Specifically, in its opening statement, in its direct testimony, and in its closing argument, the Commonwealth informed the jury that a search of Jamison's home two weeks after Naylor's death disclosed a cache of weapons and ammunition. The Commonwealth then introduced evidence of these firearms in its case-in-chief, eliciting testimony from a police officer that during an August 3, 2000 search of Jamison's home:

> I found a bunch of nine millimeter rounds. I found a Ruger P95DC, which is a black semi-automatic handgun; another full box of nine millimeter ammo; a pair of silver nick's that was loaded with nine millimeter that was filled; a black bag which contained .45 caliber rounds and nine millimeter rounds; a Foot Locker bag which contained rifle ammunition and a box that had four shotgun rounds and other rifle ammunition.

(Doc.12-6, p.10.)

---

pp.39-58), Wes Kahley and Jeff Spence (Docs. 12-5, pp.97-100, Doc. 12-6, pp.1-14.)

While emphasizing Jamison's possession of these weapons in its opening statement, ( Doc. 12-3, pp. 85), in its closing argument,(Doc. 12-7, p. 56), and in its case-in-chief, (Doc.12-6, p.10 ), the Commonwealth never linked these firearms in any way to the crime on trial, the murder of Dennis Naylor. In fact, the Commonwealth acknowledged that these guns were not used in the killing of Naylor. (Doc. 12-3, pp.85; Doc. 12-7, p. 56.) Despite this concession that the firearms and ammunition seized from Jamison's home weeks after the shooting were "not[] relevant", (Doc. 12-7, p. 56), the Commonwealth persisted in repeatedly referring to these firearms at trial, without objection, and without any explanation of their evidentiary relevance to the case.

Moreover, the Commonwealth's persistent references to this evidence which it acknowledged was "not[] relevant", (Doc. 12-7, p. 56), was done in a highly evocative and powerfully prejudicial fashion. For example, in his opening statement, the prosecutor described Jamison as a drug dealer, a calculated armed killer, and characterized the people on the scene of Naylor's shooting as fleeing "like cockroaches." (Doc. 12-3, pp. 84-5.) The prosecutor then claimed that Jamison was arrested, wearing gang colors, in the company of gang members at a funeral, and stated that a search of his home "found some guns, some ammunition, none of which matched the .40 caliber gun that shot Dennis Naylor." (Id., 85-6.)

The prosecutor reprised these themes in his closing argument to the jury, juxtaposing this evidence that he conceded was not relevant with other powerfully evocative images. Thus, in his closing, the prosecutor characterized Jamison as a gang member and drug dealer, and described Naylor's murder in the following terms:

> Somebody is undercutting you, what do you do? Bang, bang, bang, bang, kill them out of the way. Keep selling, keep that clock turning, keep clocking your shift, keep pulling that money in. That is what this case is about. . . . . What better example of malice if you believe he was there; and for that man to calmly ride up to that side of the car, pump four bullets into [Naylor] and then calmly ride away, think about that. Did we find the gun? Nope. Did we find ammunition? Nope. Searched his house, found .45's, nine millimeter gun, shotgun ammunition, nothing relevant.

(Doc. 12-7, p.56)

Thus, at the close of the trial, when this other proof of extrinsic, irrelevant, and prejudicial matters was set aside, the only evidence that was presented to the jury which actually tied Jamison to this shooting was the testimony of Dereck Sease and Liz Ray, two previously-convicted corrupt source witnesses who were themselves heavily involved in the drug milieu, were seeking favorable consideration from police on a series of charges at the time of their testimony, and both of whom had positively identified other persons as being involved in Naylor's death before testifying at trial that Jamison alone was killer in this case.

As the case was presented to the jury yet another error occurred. In its jury instructions, the trial judge erroneously notified the jurors of the penalties for first degree murder and third degree murder, while withholding from the jury the penalties for the lesser offense of manslaughter.(Doc. 12-7, pp.1-2.) The trial judge, and the Superior Court later both acknowledged that it was clear error for the court to have instructed the jury in this fashion, (Doc. 12-2, pp.8, 16-19), yet Jamison's counsel permitted this erroneous instruction without objection, clarification or explanation.

Presented with this proof, which included firearms evidence that the Commonwealth conceded was "not[] relevant", (Doc. 12-7, p. 56), and instructed in this erroneous fashion, the jury returned a compromise verdict, acquitting Jamison of both first degree murder and manslaughter, but convicting him of third degree murder, the least severe offense whose penalty was disclosed to the jurors. On July 23, 2001, Jamison was sentenced to 20-to-40 years imprisonment on this conviction. (Doc. 12, p.13.)

### D.     Post-Conviction Proceedings in State Court

Jamison appealed this conviction to the Pennsylvania Superior Court in an appellate process which was also flawed. Thus, Jamison initially filed a notice of appeal on August 7, 2001, (Doc. 12, p.36), but that initial appeal was dismissed on

procedural grounds due to appellate counsel's failure to file a statement of errors as required under Pennsylvania state appellate practice. (Doc. 12-3, p. 19.)

This error by counsel compelled Jamison to file a *pro se* post-conviction relief act petition, simply in order to re-instate his direct appeal rights. (Doc. 12-3, p.19.) With his direct appeal rights restored in 2003, Jamison appealed his conviction to the Pennsylvania Superior Court, which affirmed the Petitioner's conviction and sentence on June 22, 2004. (Doc. 12-3, pp.18-25.) Jamison did not seek Pennsylvania Supreme Court review of this Superior Court decision. Instead, on July 13, 2005, Jamison filed a second *pro se* petition under Pennsylvania's Post Conviction Relief Act, challenging his conviction and sentence. (Doc. 2-1, p. 4.)

In his Post Conviction Relief Act petition, Jamison squarely presented the Pennsylvania courts with the issues that now lie at the heart of his federal habeas corpus petition, arguing that his counsel was ineffective for, *inter alia*, (1) failing to object to irrelevant, and prejudicial, firearms, drug and gang affiliation evidence; (2) failing to present an alibi charge or alibi defense; and (3) failing to object to the trial court's erroneous jury instructions which included a recitation of penalties for some, but not all, of the crimes charged. (Id.)

Jamison was given a hearing on this Post Conviction Relief Act petition on April 21, 2006. (Doc. 12-3, pp. 26-50.) This hearing was a summary proceeding. No

witnesses were called besides Jamison himself. No exhibits were introduced. No argument was advanced by counsel on behalf of Jamison's petition. Instead, Jamison was placed under oath, and was instructed to summarize his claims. (Id.) At the close of Jamison's recital, the trial judge ruled immediately. Announcing that he was "familiar with the record," the trial court without further discussion or analysis simply stated that: "we'll deny Mr. Jamison's request for relief under the Post Conviction Hearing Act." (Doc. 12-3, p.47.) On August 18, 2006, the trial court supplemented this ruling with a written opinion. (Doc. 12-2, pp.6-11.) That opinion, however, merely listed the allegations set forth in Jamison's petition and, without further discussion, analysis or legal citation concluded that these various errors "did not undermined [sic] the truth-determining process." (Id., p.8.)

Jamison appealed this ruling to the Pennsylvania Superior Court, which issued an opinion affirming the denial of this Post Conviction Relief Act petition on December 28, 2007. (Doc. 12-2, pp.14-19, Doc. 12-3, pp.1-7.) While the Superior Court affirmed the denial of this petition, it found there had been significant errors at trial, concluding that the trial court's jury instruction was plainly erroneous, (id., pp.16-19), and finding that the introduction of firearms evidence at the trial was "questionable". (Doc. 12-3, p.6.) The Superior Court nonetheless held that these errors were not sufficiently prejudicial to warrant post-conviction relief. (Id.) In

reaching this conclusion, the Superior Court relied upon a factual assertion which seemed at odds with the proof at trial, stating in part that these acknowledged trial errors were harmless "in light of multiple witnesses testifying that Jamison held a gun, pointed it and shot into the victim's car." (Doc. 12-3, p. 7.) In fact, the Commonwealth did not present "multiple" eyewitnesses who testified that Jamison held the gun, pointed it, and fired the fatal shots.[2] Its proof on this crucial factual issue consisted of only two corrupt source witnesses, convicted criminals who were heavily ensnared in the drug milieu and were seeking favorable treatment from the government, both of whom had positively identified others as involved in Naylor's killing before they testified at trial that Jamison was the lone shooter.

In addition, the Superior Court disposed of one of Jamison's other claims in a fashion which was inconsistent with the trial record. In summarily rejecting Jamison's claim that his trial counsel was ineffective in failing to pursue an alibi defense and jury instruction, the Superior Court stated as follows:

> Other than Jamison's statement in his brief that he gave a preliminary statement to the police telling them that on the evening of the shooting he had ridden his bike across town to a bar, left the bar right before closing and then rode his bike straight home,. . . no testimony was

---

[2]The Merriam-Webster Dictionary defines "multiple" to mean: "Consisting of, including, or involving more than one, many, manifold.....". Merriam-Webster, in turn, defines, "many" as meaning "consisting of or amounting to a large but indefinite number."

presented at trial indicating that he was at a different location than that of the crime scene when the crime was committed to support an alibi. Therefore, an alibi instruction was not warranted and counsel cannot be ineffective for failing to request an unwarranted charge.

(Doc. 12-2, p.19.)

Thus, the Superior Court's rejection of this particular claim was premised upon its factual finding that "no testimony was presented at trial indicating that he was at a different location than that of the crime scene when the crime was committed to support an alibi", and that Jamison's claims regarding an alibi were nothing "[o]ther than Jamison's statement in his brief that he gave a preliminary statement to the police telling them that on the evening of the shooting he had ridden his bike across town to a bar, left the bar right before closing and then rode his bike straight home." (Id.) This factual assertion, however, failed to take into account the testimony which the Commonwealth elicited at Jamison's trial, testimony that at the time he was taken into custody Jamison provided an alibi to police stating that:

He denied any involvement. He stated that on that evening, he rode his bicycle out to Gus's Bar and that he rode right home. . . . . He stated on the evening of July 18th going into the early morning hours of July 19th, he rode his bike to Ultraviolet's Bar. . . . . He left Gus's by himself right before closing. . . . .He said he rode his bike straight home to 51 East Cottage Place.

(Doc. 12-6, pp. 9-10.)

Having concluded that the acknowledged trial errors in this case were inconsequential because "multiple" witnesses identified Jamison as the killer, and erroneously assuming that "no testimony was presented at trial indicating that [Jamison] was at a different location than that of the crime" the Superior Court affirmed the denial of relief to the petitioner.

### E.      Jamison's Federal Habeas Corpus Petition

Having effectively exhausted his available state remedies, on July 28, 2008, Jamison filed this petition for writ of habeas corpus in federal court. (Doc. 1.) In his petition, Jamison presented many of the issues which he had fully litigated in the state courts, arguing that his trial counsel was ineffective for, *inter alia*, (1) failing to object to irrelevant and prejudicial, firearms, drug and gang affiliation evidence; (2) failing to present an alibi charge or alibi defense; and (3) failing to object to the trial court's erroneous jury instructions which included a recitation of penalties for some, but not all, of the crimes charged. (Id.) Following a series of delays entailing almost two years, resulting from multiple requests by both the Petitioner and Respondents for extensions of time in which to address these issues, (Docs. 6, 8, 10, 11, 12, 14, 17, 19, 21, 25, 29, 32, 33, 37, 38, 39, 40, 41, 44, 45, and 49), this petition is fully briefed and ripe for resolution.

For the reasons set forth below, it is recommended that the petition be granted, and this matter be remanded for a new trial.

## II.    Discussion

### A.    State Prisoner Habeas Relief–The Legal Standard.

A state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus must satisfy the standards prescribed by 28 U.S.C. § 2254, which provides in part as follows:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
>
> **(A)** the applicant has exhausted the remedies available in the courts of the State;
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254 (a) and (b).

### (1.)  Substantive Standards For Habeas Petitions

As this statutory text implies, state prisoners must meet exacting substantive and procedural benchmarks in order to obtain habeas corpus relief. At the outset, a petition must satisfy exacting substantive standards to warrant relief. Federal courts may "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts. Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings led to a "fundamental defect which inherently results in a complete miscarriage of justice" or was completely inconsistent with rudimentary demands of fair procedure. See, e.g., Reed v. Farley, 512 U.S. 339, 354 (1994). Thus, claimed violations of state law, standing alone, will not entitle a petitioner to § 2254 relief, absent a showing that those violations are so great as to be of a constitutional dimension. See Priester v. Vaughan, 382 F.3d 394, 401-02 (3d Cir. 2004).

## (2).    Deference Owed to State Court Rulings.

These same principles which inform the standard of review in habeas petitions and limit habeas relief to errors of a constitutional dimension also call upon federal courts to give an appropriate degree of deference to the factual findings and legal rulings made by the state courts in the course of state criminal proceedings. There are two critical components to this deference mandated by 28 U.S.C. § 2254.

First, with respect to legal rulings by state courts, under §2254(d), habeas relief is not available to a petitioner for any claim that has been adjudicated on its merits in the state courts unless it can be shown that the decision was either: (1) "contrary to" or involved an unreasonable application of clearly established case law; see 28 U.S.C. §2254(d)(1); or (2) was "based upon an unreasonable determination of the facts," see 28 U.S.C. §2254(d)(2).  Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts.  See Rice v. Collins, 546 U.S. 333, 338-39 (2006); see also Warren v. Kyler, 422 F.3d 132, 139-40 (3d Cir. 2006);  Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002).

In addition, § 2254(e) provides that the determination of a factual issue by a state court is presumed to be correct unless the petitioner can show by clear and convincing evidence that this factual finding was erroneous. See 28 U.S.C.

§2254(e)(1). This presumption in favor of the correctness of state court factual findings has been extended to a host of factual findings made in the course of criminal proceedings. See, e.g., Maggio v. Fulford, 462 U.S. 111, 117 (1983) (per curiam); Demosthenes v. Baal, 495 U.S. 731, 734-35 (1990).

### (3.)    Ineffectiveness of Counsel,  Standard of Review

These general principles apply with particular force to habeas petitions, like Jamison's,  that are grounded in claims of ineffective assistance of counsel. It is undisputed that the Sixth Amendment to the United States Constitution guarantees the right of every criminal defendant to effective assistance of counsel.  Under federal law, a collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in order to survive.  Specifically, to prevail on a claim of ineffective assistance of counsel, a petitioner must establish that:  (1) the performance of counsel fell below an objective standard of reasonableness; and (2) that, but for counsel's errors, the result of the underlying proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687-88, 691-92 (1984).  A petitioner must satisfy both of the Strickland prongs in order to maintain a claim of ineffective counsel.  George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001).

At the outset, <u>Strickland</u> requires a petitioner to "establish first that counsel's performance was deficient." <u>Jermyn v. Horn</u>, 266 F.3d 257, 282 (3d Cir. 2001). This threshold showing requires a petitioner to demonstrate that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. <u>Id.</u> Additionally, the petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. <u>Id.</u> However, in making this assessment "[t]here is a 'strong presumption' that counsel's performance was reasonable." <u>Id.</u> (quoting <u>Berryman v. Morton</u>, 100 F.3d 1089, 1094 (3d Cir. 1996)).

But a mere showing of deficiencies by counsel is not sufficient to secure habeas relief. Under the second <u>Strickland</u> prong, a petitioner also "must demonstrate that he was prejudiced by counsel's errors." <u>Id.</u> This prejudice requirement compels the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

Thus, as set forth in <u>Strickland</u>, a petitioner claiming that his criminal defense counsel was constitutionally ineffective must show that his lawyer's "representation fell below an objective standard of reasonableness." 466 U.S. at 688. "A fair

assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689). The petitioner must then prove prejudice arising from counsel's failings. "Furthermore, in considering whether a petitioner suffered prejudice, '[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."'" Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006)(quoting Strickland, 466 U.S. at 696.). Therefore, the prejudice analysis compelled by Strickland specifically calls upon us to critically assess the strength of the government's case since "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id.

Although sometimes couched in different language, the standard for evaluating claims of ineffectiveness under Pennsylvania law are substantively consistent with the standard set forth in Strickland. See Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987); see also Werts v. Vaugh, 228 F.3d 178, 203 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel]

test did not apply a rule of law that contradicted <u>Strickland</u> and thus was not 'contrary to' established Supreme Court precedent."). Accordingly, a federal court reviewing a claim of ineffectiveness of counsel brought in a petition under 28 U.S.C. § 2254 may grant federal habeas relief if the petitioner can show that the state court's adjudication of his claim was an "unreasonable application" of <u>Strickland</u>. <u>Billinger v. Cameron</u>, 2010 U.S. Dist. LEXIS 63759, at *11 (W.D. Pa. May 13, 2010). In order to prevail against this standard, a petitioner must show that the state court's decision "cannot reasonably be justified under existing Supreme Court precedent." <u>Hackett v. Price</u>, 381 F.3d 281, 287 (3d Cir. 2004); <u>see also</u> <u>Waddington v. Sarausad</u>, __ U.S. __, 129 S. Ct. 823, 831 (2009) (where the state court's application of federal law is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted). This additional hurdle is added to the petitioner's substantive burden under <u>Strickland</u>. <u>See</u> <u>Knowles v. Mirzayance</u>, __ U.S. __, 129 S. Ct. 1411, 1420 (2009) (observing "the doubly deferential judicial review that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard."); <u>see also</u> <u>Yarborough v. Gentry</u>, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas.").

Furthermore, in a case such as this, where a state court judgment rests upon factual findings, it is also well-settled that:

> A state court decision based on a factual determination, . . . , will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceeding. <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003). We must presume that the state court's determination of factual issues was correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); <u>Campbell v. Vaughn</u>, 209 F.3d 280, 285 (3d Cir.2000). A state court's finding of the absence of discriminatory intent is "a pure issue of fact accorded significant deference," which will not be overturned unless clearly erroneous. <u>Miller-El</u>, 123 S.Ct. at 1040-41 (citation omitted).

> <u>Rico v. Leftridge-Byrd</u>, 340 F.3d 178, 181 (3d Cir. 2003).

Applying this standard of review, federal courts are obliged, however, to grant habeas relief whenever "[o]ur reading of the PCRA court records convinces us that the Superior Court made an unreasonable finding of fact." <u>Rolan v. Vaughn</u>, 445 F.3d 671, 681 (3d Cir. 2006). "But when 'the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA ... do not apply.' <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir.2001). 'In such an instance, the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA.' <u>Id</u>. A state court's factual determinations, however, 'are

still presumed to be correct, rebuttable upon a showing of clear and convincing evidence.' Id*."* Thomas v. Horn, 570 F.3d 105, 113 (3d Cir. 2009).

Moreover, in undertaking this analysis we are also mindful of the fact that we must consider the cumulative impact of all trial errors by counsel when making this prejudice assessment since:

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Albrecht v. Horn, 471 F.3d 435, 468 (3d Cir.2006). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.' " Id. (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008). Such "[c]umulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.' Brecht, 507 U.S. at 637, 113 S.Ct. 1710. See Whitney, 280 F.3d at 258-59 & n.18 (Strickland prejudice and Brecht harmless error are essentially same standard)." Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007).

## B.      Philmingo Jamison is Entitled to Habeas Relief

Applying these guiding benchmarks, we find that Philmingo Jamison's trial was marked by a series of unexplained errors by counsel, errors of a significant character, which "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. We further find that the cumulative effect of these errors had "a substantial and injurious effect or influence in determining the jury's verdict." Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008). Thus, we find that Jamison suffered "actual prejudice" as a result of these errors in that "there is a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688. We specifically conclude that the cumulative impact of these errors is "sufficient to undermine confidence in the outcome" of this trial. Id. Further, in conducting this prejudice assessment we are mindful that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006)(quoting Strickland, 466 U.S. at 696.) In this case, we find the verdict as to Philmingo Jamison to be "a verdict or conclusion only weakly supported by the record", id., since the case against Jamison rested almost entirely upon the word of two corrupt source witnesses, each of whom was deeply involved in drug use, had a motivate to falsify, and had positively identified others

as responsible for Naylor's death, before asserting that Jamison alone had killed Naylor.

Finally, in conducting this analysis, while recognizing the legal principles that cabin our review of the factual findings made by the Pennsylvania courts, we are constrained to conclude that "[o]ur reading of the PCRA court records convinces us that the Superior Court made an unreasonable finding of fact" in several crucial respects, thus further justifying habeas relief for the petitioner. Rolan v. Vaughn, 445 F.3d 671, 681 (3d Cir. 2006). The cumulative impact of these errors, and the way in which they collectively undermine confidence in the outcome of this trial, is discussed below.

### (1.) Jamison's Trial Counsel Was Ineffective in Failing to Object to Irrelevant and Highly Prejudicial Firearms Evidence at Trial.

Our assessment of these trial errors begins with the failure of counsel at trial to in any resist the introduction of completely unrelated firearms evidence into this case, evidence that the Commonwealth conceded at trial was "not[] relevant" (Doc. 12-7, p.56), but evidence that had a potentially powerful prejudicial impact. As we have noted, throughout Jamison's trial the Commonwealth alluded to this evidence which it conceded at trial was "not[] relevant" to this murder charge, (Doc. 12-7, p.

56 ), and which the Superior Court later characterized as being of "questionable" relevance in this case. (Doc. 12-3, p. 6.) Specifically, in its opening statement, in its direct testimony, and in its closing argument, the Commonwealth informed the jury that a search of Jamison's home two weeks after Naylor's death disclosed a cache of weapons and ammunition. The Commonwealth then introduced evidence of these firearms in its case-in-chief, eliciting testimony that during an August 3, 2000, search of Jamison's home a police officer testified that:

> I found a bunch of nine millimeter rounds. I found a Ruger P95DC, which is a black smei-automatic handgun; another full box of nine millimeter ammo; a pair of silver nick's that was loaded with nine millimeter that was filled; a black bag which contained .45 caliber rounds and nine millimeter rounds; a Foot Locker bag which contained rifle ammunition and a box that had four shotgun rounds and other rifle ammunition.

(Doc.12-6, p.10.)

While emphasizing Jamison's possession of these weapons in its opening statement, ( Doc. 12-3, pp.85 ) in its closing argument,(Doc. 12-7, p. 56) and in its case-in-chief, (Doc.12-6, p.10 ) the Commonwealth never linked these firearms in any way to the crime on trial, the murder of Dennis Naylor. In fact, the Commonwealth acknowledged that these guns were not used in the killing of Naylor.  (Doc. 12-3, pp.85; Doc. 12-7, p. 56.) Despite this concession that the firearms and ammunition

seized from Jamison's home weeks after the shooting were "not[] relevant", (Doc. 12-7, p. 56), the Commonwealth persisted in repeatedly emphasizing this evidence to the jury in its opening statement, in its direct testimony, and in its closing argument. Moreover, the Commonwealth's persistent references to this evidence which is acknowledged was "not[] relevant", (Doc. 12-7, p. 56), was done in a highly evocative and powerfully prejudicial fashion.

For example, it opening statement, the prosecutor described Jamison as a drug dealer, a calculated armed killer, and characterized the people on the scene of Naylor's shooting as fleeing "like cockroaches." (Doc. 12-3, pp. 84-5.) The prosecutor then claimed that Jamison was arrested, wearing gang colors, in the company of gang members at a funeral, and stated that a search of his home "found some guns, some ammunition, none of which matched the .40 caliber gun that shot Dennis Naylor". (Id., 85-6.) The prosecutor repeated this theme in his closing argument to the jury, juxtaposing this evidence that he conceded was not relevant with other powerfully evocative images. Thus, in his closing, the prosecutor characterized Jamison as a gang member and drug dealer, and described Naylor's murder in the following terms:

> Somebody is undercutting you, what do you do? Bang, bang, bang, bang, kill them out of the way. Keep selling, keep that clock turning, keep clocking your shift, keep pulling that money in. That is what this

case is about. . . . . What better example of malice if you believe he was there; and for that man to calmly ride up to that side of the car, pump four bullets into [Naylor] and then calmly ride away, think about that. Did we find the gun? Nope. Did we find ammunition? Nope. Searched his house, found .45's, nine millimeter gun, shotgun ammunition, nothing relevant."

(Doc. 12-7, p.56)

These references to this firearms evidence were not isolated, incidental or inadvertent. Rather, they were persistent, and profoundly prejudicial. These calculated, and prejudicial, references began at the outset of the trial, when in its opening statement, the Commonwealth described Jamison as a drug dealer, a calculated armed killer, characterized the people on the scene of Naylor's shooting as fleeing "like cockroaches," (Doc. 12-3, pp. 84-5), and then claimed that when Jamison was arrested a search of his home "found some guns, some ammunition, none of which matched the .40 caliber gun that shot Dennis Naylor." (Id., 85-6.) This prejudicial presentation of these inflammatory themes continued through the Commonwealth's closing argument to the jury, where the prosecutor again juxtaposed this evidence that he conceded was not relevant with other powerfully evocative images, as he characterized Jamison as a gang member and drug dealer, and described Naylor's murder in the following terms:

> Somebody is undercutting you, what do you do? Bang, bang, bang, bang, kill them out of the way. Keep selling, keep that clock turning,

keep clocking your shift, keep pulling that money in. That is what this case is about. . . . . What better example of malice if you believe he was there; and for that man to calmly ride up to that side of the car, pump four bullets into [Naylor] and then calmly ride away, think about that. Did we find the gun? Nope. Did we find ammunition? Nope. Searched his house, found .45's, nine millimeter gun, shotgun ammunition, nothing relevant."

(Doc. 12-7, p.56.)

This firearms evidence, thus, played an enduring role in the government's case, as the Commonwealth repeatedly referred to these firearms at trial, without objection, and without any explanation of their evidentiary relevance to the case. Indeed, the Commonwealth emphasized this evidence, without objection, *in spite of* the prosecution's own concession that this evidence was entirely irrelevant to the crime charged.

Yet, while the evidence was plainly irrelevant, it was also plainly inflammatory and prejudicial. The unfairly prejudicial impact of evidence concerning possession of unrelated firearms in a violent crime prosecution has long been acknowledged by the courts, and is beyond serious dispute. Thus, introduction of evidence that a defendant possessed firearms in the course of a prosecution of that defendant for unrelated threats has been found to be error of such a profoundly prejudicial quality that it compels reversal of a conviction. United States v. Himmelwright, 42 F.3d 777

(3d Cir. 1994). Similarly, systematic reference to unrelated, and prejudicial evidence of other crimes plainly constitutes an error of constitutional dimension, a fundamental denial of due process. United States v. Morena, 547 F.3d 191 (3d Cir. 2008)(systematic introduction of evidence of uncharged and unrelated drug activity mandates reversal of firearms conviction). Because of the inherently powerful prejudicial impact of this evidence, its admission will only be condoned at trial in very narrowly defined circumstances, such as when there is a particularly strong temporal relationship between the firearm and the charged crime; Baldwin v. Diguglielmo, No. 09-1396, 2010 WL 5173857 (3d Cir. Dec. 20, 2010), when evidence regarding the acquisition of the firearms is highly relevant to complete the story of how the defendant obtained the guns that he used to commit another crime; Wilson v. Vaughn, 533 F.3d 208 (3d Cir. 2008), or when the other evidence of the defendants' guilt is so overwhelming that any error at trial is harmless. Gov't of Virgin Islands v. Joseph, 685 F.2d 857 (3d Cir. 1982).

In this case, the Commonwealth cannot assert that this firearms evidence fell within any of these narrowly crafted exceptions to the general rule forbidding introduction of unrelated guns into a violent crime prosecution. At the outset, there is no strong temporal connection between these firearms, and the murder charge lodged against Jamison. In fact the Commonwealth conceded that the firearms

evidence was "not[] relevant", (Doc. 12-7, p. 56), even as the prosecution repeatedly emphasized that evidence at trial. Nor can the Commonwealth assert that this evidence was admissible because evidence regarding the acquisition of these firearms was highly relevant to complete the story of how the defendant obtained the guns that he used to commit another crime. Wilson v. Vaughn, 533 F.3d 208 (3d Cir. 2008). Quite the contrary, it is entirely undisputed that the guns and ammunition presented at Jamison's trial, and emphasized by the prosecution both in opening and closing argument, were *not* used to kill Naylor.

Given the settled, and well-defined, prohibition against the use of powerfully prejudicial evidence of unrelated firearms possession in violent crime cases, the completely unexplained failure by trial counsel to object at trial to this proof is a cardinal error, one which "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. We also find that this error was prejudicial, and had "a substantial and injurious effect or influence in determining the jury's verdict." Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008). Furthermore, in considering the prejudicial impact of this evidence in Jamison's case we again emphasize that, "'[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record

support."'" Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006)(quoting Strickland, 466 U.S. at 696).

In our view this factor–an assessment of the strength of the Commonwealth's case–weighs heavily in favor of granting habeas relief, and compels us to conclude that on this issue that: "[o]ur reading of the PCRA court records convinces us that the Superior Court made an unreasonable finding of fact." Rolan v. Vaughn, 445 F.3d 671, 681 (3d Cir. 2006). In its decision denying Jamison post-conviction relief, the Superior Court acknowledged that the presentation of this evidence was "questionable" but nonetheless sustained the denial of this relief relying upon a factual assertion which was plainly at odds with the proof at trial, and stating in part that this trial error was harmless "in light of *multiple witnesses* testifying that Jamison held a gun, pointed it and shot into the victim's car." (Doc. 12-3, p. 7, emphasis added.)

This factual finding is unreasonable and is, in fact, literally incorrect. By asserting that the Commonwealth presented "multiple" witnesses the Superior Court suggested that the Commonwealth's evidence on this issue entailed "many" witnesses, or "manifold" proof.[3] It did not. Instead, the Commonwealth's proof on

_____

[3]The Merriam-Webster Dictionary defines "multiple" to mean: "Consisting of, including, or involving more than one, many, manifold.....". Merriam-Webster,

34

this crucial factual issue consisted of only two corrupt source witnesses, convicted criminals who were heavily ensnared in the drug milieu and were seeking favorable treatment from the government. More remarkably, both of these witnesses had positively identified others as involved in Naylor's killing before they testified at trial that Jamison was the lone shooter. Recognizing this stark truth, that Philmingo Jamison was convicted on this sparse direct proof, we conclude that this conviction is "a verdict or conclusion only weakly supported by the record [which] is more likely to have been affected by [trial counsel] errors than one with overwhelming record support." ' " Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006)(quoting Strickland, 466 U.S. at 696). We, therefore, find that the systematic introduction of entirely unrelated firearms evidence throughout this trial, in an evocative and highly prejudicial fashion, was a profound error, and the failure to object to that prejudicial proof was ineffective assistance of counsel warranting habeas relief.

### (2.)     The Pennsylvania Courts Erred as a Factual Matter in Their Treatment of the Unexplained Failure of Jamison's Trial Counsel to Mount Any Alibi Defense

This initial error, standing alone, is in our view sufficient to justify habeas relief. However, we note that this error is only one of several cumulative errors by

in turn, defines, "many" as meaning "consisting of or amounting to a large but indefinite number."

counsel in this case. While the death of Jamison's trial counsel hobbles our efforts to ascertain what tactical rationale lay behind trial decisions in this case, one thing is clear. Jamieson had anticipated presenting an alibi defense, and that defense was entirely abandoned at trial, even though a government witness, a police officer, testified to Jamison's alibi. Specifically, prior to trial Jamison filed a notice of alibi defense, placing the Commonwealth on notice that he might present a defense of alibi at trial. The Commonwealth also presented evidence in its case-in-chief which indicated that Jamison had claimed an alibi at the time of his arrest. According to the arresting officer, at the time he was taken into custody Jamison had provided an alibi to police stating that:

> [Jamison] denied any involvement. He stated that on that evening, he rode his bicycle out to Gus's Bar and that he rode right home. . . . . He stated on the evening of July 18th going into the early morning hours of July 19th, he rode his bike to Ultraviolet's Bar. . . . . He left Gus's by himself right before closing. . . . .He said he road his bike straight home to 51 East Cottage Place.

(Doc. 12-6, pp. 9-10.)

Despite the introduction of this alibi into evidence by the Commonwealth's own witness, and notwithstanding the defense's prior notice of its intent to rely upon an alibi defense, no alibi was presented by Jamison's counsel at trial, the defense did not

argue Jamison's alibi in its very brief closing argument, (Doc. 12-7, pp. 44-51)[4], did

not request an alibi instruction, and the jury was not instructed on any claimed alibi

defense. In its closing argument, the Commonwealth took advantage of this defense

omission, arguing in the absence of any articulated alibi defense that: " The whole

case comes down to whether you believe Philmingo Jamison was there." (Doc.12-7,

p. 52.) Thus, the Commonwealth's presentation skillfully exploited the wholly

unexplained tactical choice by the defense to forego an alibi defense which had been

presented by the Commonwealth's own witness.

The unexplained and unjustified failure to present an alibi defense can

constitute ineffective assistance of counsel, particularly in a case such as this when

that alibi defense rests in part on the testimony of a police officer. United States v.

McGahee, 370 F.App'x 274 (3d Cir. 2010)(counsel was ineffective in not pursuing

alibi defense supported by police officer witness). While such claims of

ineffectiveness of counsel can be overcome when a complete, and accurate, factual

record is developed by the state courts, see e.g., Real v. Shannon, 603 F.3d 302 (3d

Cir. 2010); Lewis v. Horn, 581 F.3d 92 (3d Cir. 2009), regrettably no such record

---

[4]Indeed, while we are aware that length of a presentation does not always equate with effectiveness, it is striking that the entire defense closing argument in a murder case, where a defendant's entire life hangs in the balance, entailed so few transcript pages.

exists here. Quite the contrary, the state court record reveals that this issue was disposed of by the state courts on grounds which convinces us that "the Superior Court made an unreasonable finding of fact" on this question. Rolan v. Vaughn, 445 F.3d 671, 681 (3d Cir. 2006). Specifically, in rejecting Jamison's claim that his trial counsel was ineffective in failing to pursue an alibi defense and jury instruction, the Superior Court stated as follows:

> Other than Jamison's statement in his brief that he gave a preliminary statement to the police telling them that on the evening of the shooting he had ridden his bike across town to a bar, left the bar right before closing and then rode his bike straight home,. . . no testimony was presented at trial indicating that he was at a different location than that of the crime scene when the crime was committed to support an alibi. Therefore, an alibi instruction was not warranted and counsel cannot be ineffective for failing to request an unwarranted charge.

(Doc. 12-2, p.19.)

Thus, the Superior Court's rejection of this particular claim was premised upon its factual finding that "no testimony was presented at trial indicating that he was at a different location than that of the crime scene when the crime was committed to support an alibi", and that Jamison's claims regarding an alibi were nothing "[o]ther than Jamison's statement in his brief that he gave a preliminary statement to the police telling them that on the evening of the shooting he had ridden his bike across town to a bar, left the bar right before closing and then rode his bike straight home."

(Id.) This factual assertion, however, is not consistent with police officer testimony which the Commonwealth elicited at Jamison's trial, testimony, that at the time he was taken into custody Jamison provided an alibi to police stating that:

> He denied any involvement. He stated that on that evening, he rode his bicycle out to Gus's Bar and that he rode right home. . . . . He stated on the evening of July 18th going into the early morning hours of July 19th, he rode his bike to Ultraviolet's Bar. . . . . He left Gus's by himself right before closing. . . . .He said he road his bike straight home to 51 East Cottage Place.

(Doc. 12-6, pp. 9-10.)

Given this factual error by the Superior Court, the merits of Jamison's claims concerning this wholly unexplained failure to pursue an alibi defense remain completely unaddressed. Further, given the sparse and fragile nature of the proof linking Jamison to this shooting, we find that the failure to advance this alibi claim in any fashion was both objective unreasonable and potentially prejudicial, providing further cumulative grounds for habeas relief.[5]

---

[5]The Respondents suggest that this alibi defense would have been unavailing because Jamison's alibi would still have placed him only several blocks from the murder scene. Given the tenuous nature of the Commonwealth's evidence in this matter, we are not inclined to engage in a speculative calculus that completely forgoing this defense was harmless, particularly where the Commonwealth argued in its closing at trial that: " The whole case comes down to whether you believe Philmingo Jamison was there." (Doc.12-7, p. 52.)

**(3.) Counsel's Failure to Object to Erroneous Jury Instructions Constitutes Another Cumulative Claim of Ineffectiveness Warranting Habeas Relief**

Finally, there is one other cumulative error by counsel at trial which, in combination with the other claims of ineffective assistance of counsel, warrants habeas corpus relief. At the close of the trial the trial judge committed what all parties and the Pennsylvania courts concede was a plain error. During the jury instruction, the trial judge informed that jurors of the penalties for some, but not all, of the offenses they were considering. Specifically, the trial judge erroneously advised the jury of the penalties for first and third degree murder while failing to disclose the penalties for the related charge of manslaughter.

An unexplained and unjustified failure by counsel to object to an erroneous and prejudicial jury instruction will support a claim for habeas corpus relief provided that the following three elements are shown: first, that the instruction given was erroneous; second, that the error was sufficiently plain that the failure of counsel to object falls below any objective standard of reasonableness; and, third, that the defendant suffered actual prejudice as a result of the erroneous instruction. See Whitney v. Horn, 280 F.3d 240 (3d Cir. 2002).

In this case, there is little doubt that the first two elements of a valid habeas claim based on counsel's failure to object to the trial judge's erroneous jury instruction issue are fully satisfied. At the outset, the instruction given by the trial judge is undeniably erroneous; indeed the trial judge, and the Superior Court later both acknowledged that it was clear error for the court to have instructed the jury in this fashion on the penalties for some of these crimes. (Doc. 12-2, pp.8, 16-19).

Moreover, there is no suggestion on the record that this plainly erroneous instruction was requested by defense counsel for sound tactical reasons, something which might excuse this otherwise clear error. See Reddinger v. Palakovich, No. 04-1030, 2007 WL 4287519 (M.D. Pa. Dec. 4, 2007)(failure to object to instruction to jury on penalties for first and third degree murder in Pennsylvania not ineffective assistance of counsel, when penalties instruction sought by defense counsel for sound tactical reasons). Nothing suggests that this was a tactical choice by the defense, and in the absence of some sound tactical reasons for permitting this undeniably improper information to be presented to the jury, we must conclude that counsel's performance was constitutionally deficient and fell below any objective standard of reasonableness. Whitney v. Horn, supra, 280 F.3d at 258; Gooding v. Wynder, No. 07-1243, 2009 WL 4810587 (M.D. Pa. Dec. 9, 2009)(assuming ineffectiveness when

counsel fails to object to jury instruction which provided penalties of first and third degree murder to the jury).

Thus, the sole issue that remains is the question of whether this error, and counsel's ineffective response to the error, resulted in actual prejudice to Jamison. While it has been argued in this setting that such erroneous instructions detailing the penalties for first and third degree murder are not prejudicial if the jury chooses the least severe penalty in its verdict, Gooding v. Wynder, No. 07-1243, 2009 WL 4810587 (M.D. Pa. Dec. 9, 2009), the Commonwealth cannot avail itself of this argument in Jamison's case. Indeed, this path has been foreclosed by the Pennsylvania Superior Court, which expressly rejected this claim, stating that: "[T]his argument fails to account for the fact that the trial court did not instruct the jury on the penalties associated with the lesser crimes of voluntary and involuntary manslaughter– crimes for which [Jamison] could have been convicted rather than the more severe crime of third-degree murder." (Doc. 12-2, pp.17-8.)

We concur. Indeed, we find that the court's erroneous instruction, which trial counsel inexplicably permitted, presented the very paradigm of prejudice in this setting. That instruction interjected an extraneous, erroneous, and prejudicial factor into the jury deliberations–the penalties for some of the charged crimes. Moreover it introduced this improper consideration into the jury's deliberations in an incomplete,

inaccurate and highly misleading fashion. By providing penalty information for only two of these charges–first and third degree murder– the erroneous instruction created a false choice for jurors who might find penalty considerations persuasive. It created a choice between two known penalties, while concealing from the jury other, less severe, penalty information relating to the remaining charges in the case. In a case such as this, where the evidence was weak, and a jury may seek a compromise, consensus verdict, the false penalty dichotomy created by this instruction was fraught with prejudice.

That danger of prejudice was particularly acute here, where witnesses testified that Naylor was shot following a brief, angry argument. Such proof, if credited by a jury, would have been fully consistent with a manslaughter charge. However, the jury's consideration of these charges may well have been distorted by the introduction of irrelevant, incomplete, and prejudicial penalty information, information that excluded any reference to the manslaughter penalties, while highlighting the penalties for murder.

The Superior Court correctly identified this prejudice in its opinion, but nonetheless declined to grant Jamison post-conviction relief with respect to this particular claim on other grounds. Specifically the Superior Court concluded that this error was not prejudicial in the context of Jamison's case because the defense did not

focus on issues of intent at trial, but rather simply denied that Jamison shot Naylor. (Doc. 12-2, p.18.) While this finding by the Pennsylvania courts might explain why this ineffectiveness by counsel may not have been prejudicial, when considered in isolation, it actually confirms the cumulative prejudicial impact of these combined failures by trial counsel. In effect, the Superior Court concluded that the failure by counsel to object to this instruction was harmless error only because trial counsel was presenting a defense that someone else killed Naylor. Yet, trial counsel inexplicably elected to forego an alibi defense, and permitted the Commonwealth to present what the prosecutor conceded was wholly irrelevant firearms evidence at trial, choices by counsel which in combination hopelessly impaired this particular defense strategy.

In sum, we find that Philmingo Jamison was convicted following a profoundly flawed trial marked by meager evidence of his guilt, systematic presentation of irrelevant and highly prejudicial firearms evidence, the prejudicial and unexplained abandonment of an alibi defense, and erroneous jury instructions. These combined errors were "sufficient to undermine confidence in the outcome" of this trial. Strickland , 466 U.S. at 688, a trial where "the verdict [was] only weakly supported by the record." Rolan v. Vaughn,  445 F.3d 671, 682 (3d Cir. 2006).

Throughout these proceedings, Jamison had a right to effective representation by counsel, a right which was not met by the performance of his counsel in this case.

Since counsel's performance fell below an objective standard of reasonableness, and cumulatively resulted in actual prejudice to Jamison, the petitioner is entitled to habeas corpus relief.

## III.   <u>Recommendation</u>

For the foregoing reasons it is recommended that the petition for writ of habeas corpus be granted, and this matter be remanded to the Court of Common Pleas for a new trial.[6]

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may

---

[6]We note that no party suggests that there is a material element of the factual record which has not been fully developed, and the parties concede that the death of trial counsel precludes further development of this record, therefore, the possible remedy of an evidentiary hearing in federal court to further expand the record seems neither necessary nor appropriate here. See Hardcastle v. Horn, 368 F.3d 246 (3d Cir. 2004). However, should the district court conclude that such a measure is appropriate, we stand ready to assist.

accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 11th day of March, 2011.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge